# IN THE COURT OF APPEALS OF TENNESSEE
## AT NASHVILLE

FILED

May 20, 1998

Cecil W. Crowson
Appellate Court Clerk

IN THE MATTER OF:
M.W.A., JR., C.D.A., P.C.A.,
K.M.A., and A.K.A.,

    Children under 18 years of age.

)
)
)
)
)
)
)
)
)
)

Davidson Juvenile Nos.
9619-26026, 9619-26024,
9619-26025, 9619-16537,
9619-26027

Appeal No.
01A01-9709-JV-00530

## APPEAL FROM THE JUVENILE COURT FOR DAVIDSON COUNTY AT NASHVILLE, TENNESSEE

### THE HONORABLE ANDREW J. SHOOKHOFF, JUDGE

For Plaintiff/Appellee:

John Knox Walkup
Attorney General and Reporter

Douglas Earl Dimond
Assistant Attorney General

For Defendants/Appellants:

Ronald L. Stone
Nashville, Tennessee

## AFFIRMED AND REMANDED

WILLIAM C. KOCH, JR., JUDGE

# **O P I N I O N**

This appeal involves the termination of the parental rights of the parents of five children between two and seven years of age. After a year of in-home intervention failed to correct the parents' serious parenting deficiencies, the Tennessee Department of Children's Services filed a petition in Davidson County Juvenile Court seeking to terminate both the mother's and the father's parental rights. Three paternal relatives intervened in the proceeding seeking custody of the children. Following a bench trial, the juvenile court terminated the parents' parental rights and granted permanent custody of the children to the Department rather than to their paternal relatives. On this appeal, the parents and their relatives assert that the Department failed to prove grounds for termination by clear and convincing evidence and that the trial court erred in finding that placement of the children with their relatives would not be in their best interests. We affirm the judgment terminating the parents' parental rights and placing the children in the Department's custody.

## I.

In late 1995, J.R.A. and her husband M.W.A., Sr. lived in Nashville with their four children and another older child of J.R.A.'s relationship with another man. The oldest child, A.M., was 12 years old and the four younger children were between the ages of one and four.[1] The Department of Children's Services became involved with the family after receiving reports that J.R.A. and M.W.A., Sr. were physically abusing A.M. The Department continued to provide services to the parents through mid-1996 when their fifth child, A.K.A., was born.[2]

During this time, the family was living in abject poverty in conditions described by their case manager as the worst she had ever seen. The family lived in substandard housing and slept together in the only room with heat. M.W.A., Sr. slept on the couch and J.R.A. and the children slept on the floor. Both M.W.A., Sr. and

---

[1]M.W.A., Jr. was born on July 23, 1991; C.D.A. was born on September 7, 1992; P.C.A. was born on October 11, 1993; and K.M.A. was born on October 14, 1994.

[2]A.K.A. was born on May 10, 1996.

J.R.A. come from abusive families. They have little education and borderline intellectual functioning. Their children suffer from severe developmental delays. At the time of the Department's first intervention, the three older boys had not developed any verbal skills and communicated by hand gestures and single syllables. K.M.A. had not yet learned to walk.

In June 1996, the Department petitioned the Davidson County Juvenile Court alleging that all six of the children were dependent and neglected. The Department requested the juvenile court to remove A.M. from the home because of severe physical and psychological abuse.[3] The juvenile court referee removed A.M. from the home, and he was later placed with his aunt and uncle. The referee also found that M.W.A., Jr., C.D.A., P.C.A., and K.M.A. were dependent-neglected and abused, and that A.K.A. was dependent-neglected. However, the referee permitted the children to remain in the home as long as M.W.A., Sr. and J.R.A. made progress in improving their parenting skills, continued to cooperate with in-home services, and complied with the other terms contained in the court's order.

The family continued to receive assistance from four different agencies, including ten hours of in-home intervention each week to improve parenting skills, transportation, visits by the HUGS nurse, psychological evaluations, and WIC nutritional help. However, just two weeks after A.M.'s removal from the home, a day care worker observed J.R.A. beating her children about their heads and bodies with a wooden branch while she cursed and screamed at them. On June 28, 1996, the referee granted the Department's petition for temporary custody and emergency removal of the remaining children. All of the children were placed in the custody of a foster family, and the Department developed a plan of care with a goal of reunification for the family.

After three months, the referee reviewed the case and found that the children were improving in foster care but that J.R.A. and M.W.A., Sr. had not yet acquired the necessary parenting skills and knowledge to care for the children. In the next review, the referee noted that the parents had made some progress in learning to

---

[3]The Department proved that M.W.A., Sr. had given A.M. a black eye and that both M.W.A., Sr. and J.R.A. had ostracized him from the rest of the family.

nurture, to interact, and to react less aggressively, and had moved into a clean, well-furnished home. However, one caseworker concluded that the parents still had a lot to learn and that the number of children and their high level of activity posed a continued problem for the parents. The other caseworker recommended adoption after concluding that it was doubtful that J.R.A. and M.W.A., Sr. could ever learn the skills necessary to care for all five children.

On February 21, 1997, T.G., the children's paternal aunt, filed a petition for temporary custody of the two youngest boys, P.C.A. and A.K.A. On February 26, 1997, the Department petitioned to terminate J.R.A.'s and M.W.A.,Sr.'s parental rights because of severe child abuse [Tenn. Code Ann. § 36-1-113 (g)(4) (1996)] and persistence of conditions that caused the initial removal [Tenn. Code Ann. § 36-1-113 (g)(3)(A) (1996)]. On April 1, 1997, P.A., the children's uncle, filed a petition seeking temporary custody of K.M.A., and C.A., the children's grandmother, filed a petition for temporary custody of M.W.A., Jr. and C.D.A.

Following a five-day trial, the juvenile judge terminated J.R.A.'s and M.W.A., Sr.'s parental rights because they remained unable to "perceive and respond to the depth of the children's problems" and were unwilling to "recognize and acknowledge their own abusive and neglectful behaviors." The judge found that the overwhelming credible testimony established that the children had been abused and neglected and that J.R.A. and M.W.A., Sr. were simply not competent to raise them. The judge also declined to place any of the children with their paternal relatives because of (1) the relatives' failure to come forward when the children were first removed, (2) concerns about the environments in the relatives' homes and their stated intention to return the children to J.R.A. and M.W.A., Sr., (3) hesitancy to split up the children by placing them in three separate homes, and (4) the close relationship between the children and their foster parents. J.R.A. and M.W.A., Sr. and their relatives take issue with both of the juvenile court's conclusions.

## II.

Because the decision to terminate parental rights involves fundamental constitutional rights, *see O'Daniel v. Messier*, 905 S.W.2d 182, 186 (Tenn. Ct. App.

1995), the courts must find that the Department has established by "clear and convincing evidence" the statutory grounds required to terminate the parents' parental rights. *See* Tenn. Code Ann. § 36-1-113 (c)(1) (1996); *State Dept. of Human Servs. v. Defriece*, 937 S.W.2d 954, 960 (Tenn. Ct. App. 1996). This heightened standard of review serves to prevent the unwarranted termination or interference with the biological parents' rights to their children.

Parental rights can be terminated in only a limited number of statutorily defined circumstances and then, only if a court determines that termination is in the child's best interests. *See* Tenn. Code Ann. § 36-1-113 (c)(2) (1996). Parental rights may be terminated only when continuing the parent-child relationship poses a substantial threat of harm to the child. *See Petrosky v. Keene*, 898 S.W.2d 726, 728 (Tenn. 1995). As pertinent in this case, Tenn. Code Ann. § 36-1-113 (g)(3)(A) (1996) allows the termination of parental rights if (1) the child has been removed from the home of the parent by court order for six months and (2) the conditions which led to the removal or other similar conditions still persist, are unlikely to be remedied in the near future, and the continuation of the parent-child relationship greatly diminishes the child's chances of early integration into a stable and permanent home. In addition, Tenn. Code Ann. § 36-1-113(g)(4) (1996) provides that severe child abuse against the child who is the subject of the petition or against the child's sibling or half-sibling is grounds for termination of parental rights.

The juvenile judge found that the Department established by clear and convincing evidence two grounds for terminating J.R.A.'s and M.W.A., Sr.'s parental rights – persistence of conditions and severe abuse of A.M. We agree. The evidence presented to the juvenile judge overwhelmingly shows that A.M. was abused and that his removal from the home, as well as the removal of the other children, was proper.

## A.
### EVIDENCE OF ABUSE

The record contains two findings that J.R.A. and M.W.A., Sr. abused A.M. The referee made the initial finding when A.M. was first removed from the home, and

the juvenile judge made the second finding when he concurred with the referee's findings following an evidentiary hearing. There was testimony at both hearings that (1) both parents had ostracized A.M. by forcing him to take his meals alone away from the family and (2) specific acts of abuse were perpetrated by M.W.A., Sr., including giving A.M. a black eye, dangling him from a second-story balcony, throwing him into the air and letting him fall to the ground, placing him on the hot hood of a car, picking off his scabs and pouring alcohol in the wounds, and threatening his genitals with wire pliers.

The record also contains evidence of abuse of the other children. Two weeks after A.M. was removed from the home, a day care worker observed J.R.A. beating the children with a stick while she cursed and screamed at them. Based on this evidence, we find that the Department has proved clearly and convincingly that J.R.A. and M.W.A., Sr. have abused their children in violation of Tenn. Code Ann. § 36-1-113(g)(4).[4]

## B.

### PERSISTENT CONDITIONS

The juvenile judge also concluded that J.R.A. and M.W.A., Sr. "are not now, and will not in the foreseeable future, be able to adequately parent all five children on their own." When the children were first removed from their parents' home, they were severely developmentally delayed and practically unmanageable. The children had not achieved any of the appropriate developmental milestones because of their parents' neglect, and their failure to thrive was startling to even the most experienced case workers.

Both service providers who evaluated J.R.A. and M.W.A., Sr. concluded that they lacked the parenting skills necessary to provide all five children with a safe, nurturing environment. Although the parents have improved their living conditions

---

[4]Severe child abuse may consist of specific acts of brutality, abuse, or neglect, *see* Tenn. Code Ann. § 37-1-102(b)(21)(B) (1996), or the knowing exposure of a child or the knowing failure to protect a child from abuse or neglect that is likely to cause great bodily harm. *See* Tenn. Code Ann. § 37-1-102(b)(21)(A).

with a clean, well-furnished home, they have not demonstrated that their parenting skills have improved or will likely improve in the near future even with additional support. Even the case manager who was most favorable to the parents concluded that, at best, they might be able to parent one or two of their children in the future if their parenting skills improved.

The parents' lack of progress in improving their parenting abilities is exacerbated by their steadfast refusal to recognize their own shortcomings. They continue to insist on downplaying their children's lack of language skills by saying that they are simply developing a language of their own. They also continue to insist that they are presently able to care for all five children and that the children should never have been removed from their home in the first place.

The children have thrived in their foster home and now have an opportunity to timely integrate into a stable, healthy environment. Because there is no evidence that J.R.A. and M.W.A., Sr. have corrected the conditions that led to the children's removal or that they have the ability to do so in the near future, we have determined that termination of their parental rights is supported by clear and convincing evidence of persistent conditions.

## III.

The juvenile judge also determined that placing the children with their paternal relatives, rather than with their foster family, would not be in the children's best interests. We agree for three reasons. First, the relatives ignored the serious parenting deficits of J.R.A. and M.W.A., Sr., as evidenced by their failure to intervene at the time of removal and their stated desire to return the children to their parents. Second, placing the children with their relatives would require sending them to three different homes, one of which is located out of state. Third, the evidence also calls into question the fitness of the relatives' homes. Both the paternal grandmother and the paternal uncle have already had problems with the Department relating to the care of their own children. The paternal aunt and her husband initially indicated that they had their hands full raising five children of their own. Most importantly, all of the relatives testified that it was their plan to keep the children temporarily until they

could be returned to J.R.A. and M.W.A., Sr. Based on our review of the record, we concur with the juvenile judge's conclusion that the record contains clear and convincing evidence that the children's interests will be served best by permitting them to remain with their present foster family instead of with their paternal relatives.

## IV.

We affirm the judgment terminating the parental rights of J.R.A. and M.W.A., Sr. and remand the case to the juvenile court for whatever further proceedings may be required. We tax the costs of this appeal to the Tennessee Department of Children's Services.

_____
WILLIAM C. KOCH, JR., JUDGE


CONCUR:


_____
HENRY F. TODD, PRESIDING JUDGE
MIDDLE SECTION


_____
BEN H. CANTRELL, JUDGE