IN THE COURT OF APPEALS OF TENNESSEE
AT KNOXVILLE
August 25, 2015 Session

**IN RE: GREG S.**

**Appeal from the Juvenile Court for Knox County**
**No. 36251      Timothy E. Irwin, Judge**

---

**No. E2015-00333-COA-R3-PT-FILED-OCTOBER 19, 2015**

---

This appeal concerns the termination of a father's parental rights. The Tennessee Department of Children's Services ("DCS") filed a petition in the Juvenile Court for Knox County ("the Juvenile Court") seeking to terminate the parental rights of Greg S. ("Father") to his minor child Greg S., Jr. ("the Child").[1] The Juvenile Court terminated Father's parental rights to the Child on the ground of substantial noncompliance with the permanency plan. Father appeals to this Court arguing only that it is not in the Child's best interest for Father's parental rights to be terminated. We affirm the judgment of the Juvenile Court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Juvenile Court Affirmed; Case Remanded**

D. MICHAEL SWINEY, J., delivered the opinion of the court, in which JOHN W. MCCLARTY and THOMAS R. FRIERSON, II, JJ., joined.

Katheryn K. Murray, Knoxville, Tennessee, for the appellant, Greg S.

Herbert H. Slatery, III, Attorney General and Reporter, and, Rebekah A. Baker, Senior Counsel, for the appellee, the Tennessee Department of Children's Services.

---

[1] There is some discrepancy in the record as to whether Father's first name is spelled "Gregg" or "Greg." Greg appears to be the most common spelling in the record.

# OPINION

## <u>Background</u>

The Child was born in October 2013 to parents Bridgetta M. ("Mother") and Father. DCS filed a petition to have the Child declared dependent and neglected because Mother had tested positive for cocaine while pregnant with the Child. The Child subsequently was declared dependent and neglected, and found to be a victim of severe abuse. The Child was placed with a maternal relative. A permanency plan was fashioned for Father. The initial permanency plan contained a number of requirements for Father, including: obtain an alcohol and drug assessment; accept treatment recommendations and comply with outpatient treatment recommendations; provide a safe home for the Child; and, refrain from associating with known drug users. Father completed an alcohol and drug assessment in July 2014. The results indicated that Father had mild symptoms of post-traumatic stress disorder. Father asserted that his drug of choice was cocaine, and he had used the drug about four times per month. His final use was four days before the assessment. Father also reported drinking a quart of liquor three times per week. Father tested positive for cocaine and benzodiazepines on the date of the assessment. The assessor recommended an intensive outpatient program. Father, however, never completed the intensive outpatient program. Father had worked at the University of Tennessee for over thirty years.

DCS filed a petition to terminate Father's parental rights in December 2014. The case was tried in February 2015. At trial, Father acknowledged that he had not consistently visited the Child. Father stated that he was working sixty to eighty hours per week. Father had continued to live with Mother, who by then had been found to have committed severe child abuse, and married her in November 2014. The testimony was that the Child was developing well in the foster home.

In March 2015, the Juvenile Court entered an order terminating Father's parental rights to the Child. We quote from the order concerning the ground found for termination of Father's parental rights, that of substantial noncompliance with the permanency plan:

> [The Child] was born out of wedlock to Respondent and [Mother] on October 8, 2013, in Knox County, Tennessee. The temporary custody of this child was awarded to the State of Tennessee, Department of Children's Services, on April 1, 2014, by order of the Juvenile Court of Knox County, Tennessee; he has been in foster care continuously since that date. An order finding the child dependent and neglected was issued by this Court

following a hearing on April 1, 2014. The termination petition was filed against Respondent on December 2, 2014.

II

1. This child was removed from his parents' custody at birth due to their substance abuse. His mother had failed multiple drug screens for cocaine and marijuana during her pregnancy. Respondent admitted that he, too, had been using cocaine and would fail a drug screen. Custody of the child was transferred temporarily to a maternal relative and then to the Department of Children's Services after the relative completed the requirements for kinship foster care.

2. The initial permanency plan was developed at a Child & Family Team Meeting on April 27, 2014, with Respondent's presence and participation. Among other things, the plan required that he (a) complete an alcohol and drug assessment, comply with all resulting recommendations including treatment and aftercare, and pass random drug screens to demonstrate sobriety; (b) cooperate with therapeutic visitation, complete parenting education either through that provider or in an independent course, and demonstrate learned skills during visitation; (c) obtain and maintain safe, suitable housing for himself and his child free from environmental hazards, domestic violence, drug abuse, or other risks to the child. Respondent understood that the child's mother had unresolved substance abuse, mental health, and criminal issues and that choosing to continue to live with her under those circumstances would be a barrier to gaining custody of this child. The plan also required him to visit regularly and to pay child support.

3. Respondent finally completed an alcohol and drug assessment on July 17, 2014, after failing to cooperate with scheduling the month before. He was positive for cocaine and benzodiazepines and admitted drinking alcohol at least three days a week. The evaluator recommended intensive outpatient substance abuse treatment. Respondent has asserted on several different occasions since then that he was about to begin substance abuse treatment but has never actually done so. He admitted during this hearing that he used to have a big problem with cocaine but claimed that he had stopped on his own. He testified that he could not get treatment because he did not have insurance (despite full-time employment at the University of Tennessee for more than a decade) and that he worked too many hours in the summer to take advantage of grant-based programs.

4. Respondent was offered visitation on a weekly basis but has not taken advantage of that opportunity at all. He saw the child a few times in April and May and was advised on May 19, 2014, that visits would occur every Wednesday afternoon at the Department's office. He came to one

visit in June and then showed up on July 2, 2014, for the first therapeutic visit. He was informed that those visits would continue on the same schedule. The child's mother was arrested on June 6, 2014, and remained in jail continuously until November 24, 2014. She then entered a 28-day residential substance abuse treatment program. Her first visit with this child after her incarceration occurred on January 16, 2015. Respondent showed up with her. He had visited his son only one other time during the mother's incarceration. He either cancelled or simply failed to appear. He again blamed his summer work schedule.

5. Respondent continues to reside in the home from which the child was removed, a residence in suitable physical condition for the child. He works. He has now married the child's mother, with whom he had been living for 6 years. She might be sober now.

7. This Court has previously found that the child's mother, [Mother], committed severe abuse against this child, due to her knowing exposure of the child to illicit drugs *in utero*. Respondent and the child's mother were living together during this pregnancy; Respondent was using cocaine and other illicit drugs along with her. This Court has also found that [Mother] committed severe (physical) abuse against her older child, Kaedince [M.], based on the extent of the injuries and the location of the injuries inflicted on the child by her mother. On March 13, 2014, [Mother] entered a guilty plea to the charge of child abuse and was granted judicial diversion for a probation term of 364 days. She subsequently failed a drug screen for cocaine and her diversion was revoked. On May 2, 2014, she was sentenced to "11/29" and released to probation on condition that she enter and complete IOP treatment at Peninsula. She again failed to comply and her probation was revoked. She returned to jail on June 6, 2014, and remained in jail until November 24, 2014, when she was released upon condition that she complete a 28-day residential substance abuse treatment program.

8. While [Mother] was in jail, Respondent repeatedly acknowledged his understanding that no child would be returned to a home in which she was living unless she had completed her permanency plan responsibilities and established to the satisfaction of this Court that she no longer presented a risk of any kind to the child. Upon [Mother]'s release from jail, Respondent married her and they resumed living together in his home once she returned from treatment. Based upon her brief period of sobriety, this Court was unable to find in her case that the conditions that led to removal still persist. The Court has a similar problem in this case to the extent that those conditions were largely based on the mother's substance abuse and the mother's conduct while using.

-4-

9. The Court does, however, find that Respondent has failed to comply in a substantial manner with those reasonable responsibilities set out in the permanency plan related to remedying the conditions which necessitate foster care placement. He had very little to do but he just didn't do it. The Court cannot get around the fact that he failed to visit almost the entire time his wife was in jail. One visit in June, one visit in July, one visit in August - when visits were scheduled every week - and then nothing until the middle of January. Of course this child does not know him.

We next quote from the Juvenile Court's order as it pertains to the Child's best interest:

1. The statutory factors this Court must consider in determining best interest are not a score card. Each factor does not get assigned a number of equal weight to be tallied. Has Respondent or another person residing with him shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward this child or another child in the family or household? Yes, Respondent's wife committed brutality and physical abuse toward her children in two different ways. Emotional and psychological abuse go along with that. And neglect. She may now be doing everything she's been recommended to do but she has just begun. We don't know yet whether her efforts will result in a "lasting" adjustment. And so long as Respondent chooses to live with her, his adjustment of circumstances is dependent upon hers. Has Respondent maintained regular visitation or otherwise established a meaningful relationship with the child? No, his son doesn't know him at all, even preferring the company of the Department's case manager. That is understandable, given that his kinship foster mother is the only parent the child has ever known and that he has seen the case manager on a regular basis. The child's mother was incarcerated and could not visit; Respondent had no similar excuse. Removing this child from the only home he has ever known would be devastating to him. He has been there since birth; he recognizes that home and that family as his own.
2. The parental rights of the child's mother are being terminated on this same date by companion order.
3. The Department of Children's Services has made reasonable efforts toward achieving permanency for this child.
4. The child is entitled to a safe, secure and loving home. He is now thriving along with his half-sister in the care of their mother's aunt where they will remain part of the extended family even through adoption. They are safe and happy and the[y] have the chance to achieve permanency. They deserve to know where they will lay their heads at night.

5. It is, therefore, in the best interest of [the Child], and the public that all of Respondent's parental rights to this child be terminated and the complete custody, control, and full guardianship of the child be awarded to the State of Tennessee, Department of Children's Services, with the right to place him for adoption and to consent to such adoption in loco parentis.

6. Respondent is not hereafter entitled to notice of proceedings for the adoption of this child nor has he any right to object to such adoption or otherwise to participate in such proceedings.

Father filed a timely appeal to this Court.

## Discussion

Father raises one issue on appeal: whether the Juvenile Court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest.

Our Supreme Court reiterated the standard of review for cases involving termination of parental rights stating:

This Court must review findings of fact made by the trial court *de novo* upon the record "accompanied by a presumption of the correctness of the finding, unless the preponderance of the evidence is otherwise." Tenn. R. App. P. 13(d). To terminate parental rights, a trial court must determine by clear and convincing evidence not only the existence of at least one of the statutory grounds for termination but also that termination is in the child's best interest. *In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002) (citing Tenn. Code Ann. § 36-1-113(c)). Upon reviewing a termination of parental rights, this Court's duty, then, is to determine whether the trial court's findings, made under a clear and convincing standard, are supported by a preponderance of the evidence.

*In re F.R.R., III*, 193 S.W.3d 528, 530 (Tenn. 2006).

In *Department of Children's Services v. D.G.S.L.*, this Court discussed the relevant burden of proof in cases involving termination of parental rights stating:

It is well established that "parents have a fundamental right to the care, custody, and control of their children." *In re Drinnon*, 776 S.W.2d 96, 97 (Tenn. Ct. App. 1988) (citing *Stanley v. Illinois*, 405 U.S. 645, 92 S. Ct. 1208, 31 L. Ed. 2d 551 (1972)). "However, this right is not absolute and

parental rights may be terminated if there is clear and convincing evidence justifying such termination under the applicable statute." *Id.* (citing *Santosky v. Kramer*, 455 U.S. 745, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982)).

Termination of parental or guardianship rights must be based upon a finding by the court that: (1) the grounds for termination of parental or guardianship rights have been established by clear and convincing evidence; and (2) termination of the parent's or guardian's rights is in the best interests of the child. Tenn. Code Ann. § 36-1-113(c). Before a parent's rights can be terminated, it must be shown that the parent is unfit or substantial harm to the child will result if parental rights are not terminated. *In re Swanson*, 2 S.W.3d 180, 188 (Tenn. 1999); *In re M.W.A., Jr.*, 980 S.W.2d 620, 622 (Tenn. Ct. App. 1998). Similarly, before the court may inquire as to whether termination of parental rights is in the best interests of the child, the court must first determine that the grounds for termination have been established by clear and convincing evidence. Tenn. Code Ann. § 36-1-113(c).

*Dep't of Children's Servs. v. D.G.S.L.*, No. E2001-00742-COA-R3-JV, 2001 WL 1660838, at *6 (Tenn. Ct. App. Dec. 28, 2001), *no appl. perm. appeal filed*. Clear and convincing evidence supporting any single ground will justify a termination order. *E.g., In re Valentine*, 79 S.W.3d 539, 546 (Tenn. 2002).

Although Father does not raise grounds for termination of his parental rights as an issue on appeal, we nevertheless will address grounds. Tenn. Code Ann. § 36-1-113 (g)(2) (Supp. 2015) provides the relevant ground for termination of parental rights as follows: "There has been substantial noncompliance by the parent or guardian with the statement of responsibilities in a permanency plan pursuant to the provisions of title 37, chapter 2, part 4." Our Supreme Court has stated with respect to substantial noncompliance:

Substantial noncompliance is a question of law which we review de novo with no presumption of correctness. Substantial noncompliance is not defined in the termination statute. The statute is clear, however, that noncompliance is not enough to justify termination of parental rights; the noncompliance must be substantial. Black's Law Dictionary defines "substantial" as "[o]f real worth and importance." *Black's Law Dictionary* 1428 (6th ed.1990). In the context of the requirements of a permanency plan, the real worth and importance of noncompliance should be measured by both the degree of noncompliance and the weight assigned to that

-7-

requirement. Terms which are not reasonable and related are irrelevant, and substantial noncompliance with such terms is irrelevant.

*In re Valentine*, 79 S.W.3d at 548-49.

The Juvenile Court found one ground upon which to terminate Father's parental rights to the Child: that of substantial noncompliance with the permanency plan. Father does not challenge this ground on appeal. Our careful review of the record leads us to conclude that the evidence for Father's substantial noncompliance with his permanency plan responsibilities is indeed clear and convincing. We find and hold, as did the Juvenile Court, that the evidence is clear and convincing to establish the ground of substantial noncompliance with the permanency plan.

We now address whether the Juvenile Court erred in finding by clear and convincing evidence that termination of Father's parental rights was in the Child's best interest. The following statutory factors are to be considered by courts when determining whether termination of parental rights is in the child's best interest:

(i) In determining whether termination of parental or guardianship rights is in the best interest of the child pursuant to this part, the court shall consider, but is not limited to, the following:

(1) Whether the parent or guardian has made such an adjustment of circumstance, conduct, or conditions as to make it safe and in the child's best interest to be in the home of the parent or guardian;

(2) Whether the parent or guardian has failed to effect a lasting adjustment after reasonable efforts by available social services agencies for such duration of time that lasting adjustment does not reasonably appear possible;

(3) Whether the parent or guardian has maintained regular visitation or other contact with the child;

(4) Whether a meaningful relationship has otherwise been established between the parent or guardian and the child;

(5) The effect a change of caretakers and physical environment is likely to have on the child's emotional, psychological and medical condition;

(6) Whether the parent or guardian, or other person residing with the parent or guardian, has shown brutality, physical, sexual, emotional or psychological abuse, or neglect toward the child, or another child or adult in the family or household;

(7) Whether the physical environment of the parent's or guardian's home is healthy and safe, whether there is criminal activity in the home, or whether there is such use of alcohol, controlled substances or controlled substance analogues as may render the parent or guardian consistently unable to care for the child in a safe and stable manner;

(8) Whether the parent's or guardian's mental and/or emotional status would be detrimental to the child or prevent the parent or guardian from effectively providing safe and stable care and supervision for the child; or

(9) Whether the parent or guardian has paid child support consistent with the child support guidelines promulgated by the department pursuant to § 36-5-101.

Tenn. Code Ann. § 36-1-113 (i) (Supp. 2015).

Father argues that he has made considerable changes in his life such as to render him a fit parent. Father submits as examples of his improvement that he quit using drugs; his marrying Mother; his maintaining stable housing and employment; and, his having established a relationship with the Child despite the paucity of contact. Father also notes the gravity of terminating parental rights.

The Juvenile Court made detailed findings regarding best interest as quoted above. The evidence in the record on appeal does not preponderate against the Juvenile Court's findings. As the Juvenile Court correctly noted, the weight to be drawn from best interest factors differs from case to case, and the factors are not a score card. One of the central issues in this case relating to the Child's best interest is his exposure to drug use. Even accepting Father's testimony that he has quit using drugs, Father's failure to complete an intensive outpatient drug program raises serious concerns about whether Father can stay off drugs.

An additional major concern, also related to drugs, both to the Juvenile Court and this Court is Father's living with and now marriage to Mother. By our opinion in Mother's separate appeal, which is to be released concurrently with this opinion, we are affirming the termination of Mother's parental rights to the Child. While this Court is not in the business of dictating people's relationship choices, Father's decision to live

with and marry Mother raises serious concerns about the Child's best interest should Father retain his parental rights. The Child deserves and must have an environment free from drug and other abuse. Father has not shown, in sufficient depth or time, that he is in a position to provide such an environment. On the contrary, Father's continued living with Mother and now marriage to Mother present renewed danger to the Child. Meanwhile, the Child is thriving in foster care, and changing caregivers at this point would be an unjustifiably risky move.

We find and hold, as did the Juvenile Court, that clear and convincing evidence establishes the ground of substantial noncompliance with the permanency plan in order to terminate Father's parental rights to the Child, and the evidence is clear and convincing that termination of Father's parental rights is in the Child's best interest. We affirm the judgment of the Juvenile Court terminating Father's parental rights to the Child.

## **Conclusion**

The judgment of the Juvenile Court is affirmed, and this cause is remanded to the Juvenile Court for collection of the costs below. The costs on appeal are assessed against the Appellant, Greg S., and his surety, if any.

_____
D. MICHAEL SWINEY, JUDGE